**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

A.G., a minor, by his Mother and Next Friend CIERRA CORBITT, and CIERRA CORBITT individually,

Plaintiffs,

v.

NOAH BALL, individually and as agent of CITY OF CHICAGO; and CITY OF CHICAGO, a municipal corporation,

Defendants.

No. 22-cv-05896

Judge John J. Tharp, Jr.

# ORDER

For the reasons set forth in the Statement below, the defendant City of Chicago's motion to dismiss the plaintiffs' *Monell* and Family Expense Act claims [29] is denied.

# STATEMENT

## I. Background

The following facts, alleged in the plaintiffs' complaint, are taken as true at the motion to dismiss stage.

### a. *May 2022 Shooting*

On the evening of May 18, 2022, plaintiff A.G., then 13 years old, was riding as a passenger in a Honda Accord, with members of the Chicago Police Department ("CPD") in pursuit. Compl. ¶ 23, ECF No. 1. At some point, A.G. got out of the car and ran. *Id*. ¶ 24. Several CPD officers, including defendant Noah Ball, chased him on foot. *Id*. ¶¶ 24-26. Multiple police vehicles were nearby, in addition to a CPD helicopter overhead. *Id*. ¶ 24.

According to witness accounts, while A.G. was running, he was told by one or more of the officers to stop and put his hands up. *Id*. ¶ 25. He did as he was directed. *Id*. At or about the same time, Ball, who had been running behind A.G. with his gun unholstered, shot A.G. *Id*. ¶ 26. A.G. did not have a weapon or behave in a way to make Ball believe he was armed or dangerous. *Id*. ¶ 28. However, after the shooting, Ball completed an official report claiming he shot A.G. in self-defense. *Id*. ¶ 6. The shooting paralyzed A.G. from the waist down and caused a number of other injuries. *Id*. ¶¶ 1, 30.

Given that A.G. posed no immediate threat, and was in compliance with the officers' orders, Ball's conduct violated CPD's Use of Force Policy. *Id*. ¶¶ 32-44. It also violated CPD's

Foot Pursuit Policy at the time, which provided that it was only reasonable to engage in a foot pursuit with an unholstered gun if the suspect presents a heightened risk to the public (*e.g.*, is in possession of gun), and that foot pursuits should be avoided if a suspect can be contained or surveilled by alternative means, such as requesting assistance from helicopters, which were present the night of A.G.'s shooting. *Id*. ¶¶ 46-59. Finally, Ball failed to activate his body worn camera, in violation of CPD's Body Worn Camera Policy. *Id*. ¶¶ 62-66.

b. *Previous Shooting by Officer Ball*

Officer Ball was involved in a similar incident in June 2021. Ball was in pursuit of a suspect, on foot, who had gotten out of his car and begun to run from the police. *Id*. ¶ 6. Ball fired at the suspect, but missed. *Id*. Ball claimed in an official report that he fired at the fleeing suspect in self-defense; however, upon the plaintiffs' information and belief, Ball was not under threat of imminent harm and the shot was not fired in self-defense. *Id*. ¶¶ 6-7. As with his pursuit of A.G., Ball failed to activate his body worn camera during the June 2021 shooting. *Id*. ¶ 9. The shooting remains under investigation by the Civilian Office of Police Accountability. *Id*. ¶ 8. Upon the plaintiffs' information and belief, CPD did not provide Ball with additional training following the incident, and allowed him to remain an active armed patrol officer. *Id*.

c. *CPD Consent Decree*

Since March 2019, the City of Chicago has been under a Consent Decree to address, among other issues, CPD's historic pattern and practice of using excessive force disproportionately against African Americans. *Id*. ¶ 87; *see also* Consent Decree, *State of Illinois v. City of Chicago*, No. 17-cv-06260 (N.D. Ill. Jan. 31, 2019), Dkt. No. 703. The Consent Decree was preceded by multiple investigative reports regarding CPD's practices, and arose from a federal lawsuit brought by the Illinois Office of the Attorney General against the City of Chicago. *See* Independent Monitoring Report 1 6-7, *State of Illinois v. City of Chicago*, No. 17-cv-06260 (N.D. Ill. Nov. 18, 2019), Dkt. No. 798.

In April 2016, the Police Accountability Task Force, chaired by future City of Chicago mayor Lori Lightfoot, issued a report finding that "data establishes that CPD's use of force disproportionately affects people of color," that "there must be a fundamental re-thinking of the current use-of-force policies," and that "CPD does not have a robust strategic approach for ensuring that all officers have ongoing training and professional development opportunities[.]" Compl. ¶ 84 (quotation marks omitted). In January 2017, the Department of Justice released the results of its own investigation, which included findings that "CPD officers engage in a pattern or practice of using force, including deadly force, that is unreasonable," that "CPD has not provided officers with adequate guidance to understand how and when they may use force, or how to safely and effectively control and resolve encounters to reduce the need to use force," that "CPD has tolerated racially discriminatory conduct," and that "officers engage in tactically unsound and unnecessary foot pursuits." *Id*. ¶ 85. Since the summer of 2017, when the lawsuits that led to the Consent Decree were filed, the City of Chicago Office of Inspector General has compiled use of force data which confirms that Chicago police officers use excessive force, including lethal force, against minorities (and specifically African Americans) disproportionately. *Id*. ¶¶ 88-92.

i. Foot Pursuit Policy

As part of the Consent Decree process, CPD planned to modify its Foot Pursuit Policy to make clear that chasing a suspect on foot should no longer be considered an automatic response to a fleeing suspect. *Id*. ¶ 71. The Consent Decree's deadline to implement an updated Foot Pursuit Policy was September 3, 2021. *Id*. ¶ 75. CPD did not meet that deadline. *Id*. The Consent Decree's Independent Monitor ("IM") explained in a recent report that "the CPD made the path to a permanent foot-pursuit policy more difficult than it could have been . . . ." *Id*. One of the primary reasons for the delay was CPD's failure to collect accurate data; the IM also recently reported that "[i]n the middle of 2021, CPD disabled its foot pursuit data dashboard and revealed that the data it had collected over the past two years was flawed, causing it to fall out of compliance with certain requirements. . . . With the expected implementation of the new foot pursuit [policy] in the next several months, and the need for reliable, transparent tracking of use of force data, CPD must quickly rectify its data collection practices." *Id*. ¶ 80. At the time of A.G.'s shooting, CPD had a temporary foot pursuit policy which had been in place for one year and was widely criticized. *Id*. ¶¶ 46, 70.

CPD has not complied with other metrics set forth by the Consent Decree. For example, the decree requires that CPD officers not use deadly force against fleeing subjects who do not pose an imminent threat of death or great bodily harm and that CPD provide scenario-based training regarding foot pursuits. *Id*. ¶¶ 78-79. CPD has not yet reached a state of compliance with either of those terms. *Id*.

ii. Departure of CPD leaders

In August 2021, a Commanding Officer who was involved in the administration of the Consent Decree resigned. *Id*. ¶ 15. In his notice of resignation, the Officer wrote: "[M]y disappointment with the inability of this Department's top leadership to even feign interest in pursuing reform in a meaningful manner has made it impossible for me to remain involved. . . . Despite my efforts, both the Office of the Superintendent and the Office of Constitutional Policing & Reform continue to insist upon employing a 'check the boxes' strategy that focuses on getting credit for 'preliminary compliance' based primarily on policy edits that lack operational considerations." *Id*.

One year later, CPD Superintendent David Brown fired Robert Boik, CPD's Executive Director for Constitutional Policing and Reform, who had previously been responsible for CPD's compliance with the Consent Order. *Id*. ¶ 16. Shortly before his termination, Boik emailed Brown urging him to reconsider a decision to transfer members of Boik's staff to patrol duty, explaining that those officers were needed to "serve as trainers so that we can meet our court-mandated obligation to provide 40 hours of in-service training to every sworn member." *Id*.

## II. Analysis

The plaintiffs' complaint sets forth two theories of *Monell* liability against the City of Chicago. The first is that CPD has a longstanding pattern and practice of using excessive force against African Americans and have acted with deliberate indifference to the known or obvious risks to the constitutional rights of African Americans by failing to address the problem. *Id*. ¶¶

110-18. The second is that CPD has been deliberately indifferent to the constitutional rights of minorities through its failure to provide officers with adequate training on implicit bias, use of force, and foot pursuits, as well as its failure to hold officers like defendant Ball accountable for their actions. *Id*. ¶¶ 119-31. The plaintiffs have also pleaded a violation of the Illinois Family Expense Act, *see* 750 ILCS 65/15, that is derivative of their *Monell* theories. *Id*. ¶¶ 139-141. The City now moves to dismiss those claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

a. *Monell*

A municipality may not be held liable for an officer's unconstitutional acts solely on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). However, if a plaintiff can show that the "execution of a government's policy or custom" inflicted their constitutional injury, the municipality may be held liable under 42 U.S.C. § 1983. *Id*. at 694. To state a claim under *Monell*, the plaintiff must allege the existence of either:

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995) (quotation marks omitted). In addition, the plaintiff must "demonstrate that the [municipality's] official policy, widespread custom, or action by an official with policy-making authority was the 'moving force' behind his constitutional injury." *Dixon v. Cnty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (quoting *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)). Finally, the plaintiff must show that the "policymakers were deliberately indifferent as to the known or obvious consequences" of their policy or custom; that is, they were "aware of the risk created by the custom or practice and . . . failed to take appropriate steps to protect the plaintiff." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (quotation marks omitted).

The City does not contest that the plaintiffs have pleaded a widespread practice and custom within CPD which, the plaintiffs allege, caused their injuries. Def.'s Reply in Support of Mot. to Dismiss 2, ECF No. 44 ("Defendants have not challenged the sufficiency of Plaintiffs' 'policy and practice' allegations."). It focuses instead on the plaintiffs' allegation that the City was "deliberately indifferent" to those practices, and the plaintiffs' allegations with respect to causation.

i. Deliberate Indifference

A municipality's "continued adherence to an approach that [municipal employees] know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Bd. Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407-08 (1997). Ultimately, "[a] plaintiff must prove that it was obvious that the municipality's action would lead to constitutional

violations and that the municipality consciously disregarded those consequences." *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021).

The plaintiffs here allege that the City has acted with deliberate indifference because it was aware of CPD's long-standing pattern and practice of using excessive force against African Americans, but failed to do anything to address the problem. Specifically, the plaintiffs allege that the City failed to train officers on use of force, foot pursuits, and implicit bias; failed to implement any foot pursuit policy at all for years; failed to update its inadequate temporary foot pursuit policy (which was in place at the time of A.G.'s shooting); failed to analyze data on use of force and foot pursuits; and failed generally to implement meaningful reform to address the disproportionate use of force against African Americans. The City also exhibited deliberate indifference, the plaintiffs assert, by allowing Ball to continue working as a patrol officer despite his previous shooting in June 2021.

The City, for its part, argues that the efforts it has made to comply with the Consent Decree—efforts which are memorialized in reports from the Independent Monitoring Team ("IM"), appointed by Judge Dow to assess the City's compliance with the Consent Decree's requirements—make the plaintiffs' allegations of deliberate indifference implausible. The City argues that "[t]aken as a whole, the measures in place and the changes being made by the City do not demonstrate deliberate indifference . . . ." *Lapre v. City of Chicago*, 911 F.3d 424, 432 (7th Cir. 2018).

As a threshold matter, the City leans heavily on the contents of the semi-annual IM reports for evidence of its efforts to prevent constitutional violations resulting from the CPD's pattern and practice of using excessive force against African Americans. As one example, the City points to its revisions to the policy directive G02-04, titled "Prohibitions Regarding Racial Profiling and Other Biased-Based Policing." Those revisions, the City says, are detailed in the IM reports, and include the identification of stereotypes that officers should not use as the basis for law enforcement decisions and the inclusion of age as a factor in biased-based policing in light of CPD's historical interactions with young adults. The City also highlights the IM report in which the temporary foot pursuit policy, which was in place at the time of A.G.'s shooting and is alleged by the plaintiff to have been "widely criticized," Compl. ¶ 70, was described by the IM as "incorporate[ing] best practices and . . . modeled after other peer agencies (e.g., Baltimore, Maryland)." Def.'s Mot. to Dismiss 8, ECF No. 29 (quoting Independent Monitoring Report 4 308, *State of Illinois v. City of Chicago*, No. 17-cv-06260 (N.D. Ill. Oct. 8, 2021), Dkt. No. 978). In addition, the City details how the IM, in its reports, found the CPD's Use of Force in-service training adequate to address the Consent Decree's requirements.

The plaintiffs object to the City's use of this material, arguing that it is inappropriate for the Court to consider evidence outside the four corners of the complaint in deciding its motion to dismiss. The City responds that the IM reports and various CPD directives are cited extensively in the plaintiffs' complaint, central to the plaintiffs' claims, and are therefore proper for judicial notice.

While the plaintiffs' complaint does include quotations from the IM reports, the City asks the Court to do far more than simply take judicial notice of the documents themselves. It asks that the Court take as true the IM's various observations and assessments and use them as the basis for

dismissing the plaintiffs' allegations. That is a step too far for the 12(b)(6) stage. At this juncture, the Court must "determine the sufficiency of the well-pleaded allegations in the complaint—not the sufficiency of the underlying facts." *Curtis v. Cook Cnty.*, No. 18-cv-05783, 2019 WL 296555, at *2 (N.D. Ill. Jan. 23, 2019). And "[a]lthough a court may generally take judicial notice of public records, under Federal Rule of Evidence 201, a court may judicially notice only ***a fact*** that is not subject to reasonable dispute." *Tobey v. Chibucos*, 890 F.3d 634, 647-48 (7th Cir. 2018) (emphasis added). Even if the Court were to take notice of the contents of the IM reports—all 5,000-plus pages of them—as the plaintiffs point out, they present at best a mixed record as to the City's efforts to comply with the Consent Decree. For example, at the time of A.G.'s shooting, the City was not yet in compliance with several Consent Decree requirements related to unbiased policing, and the IM had expressed skepticism that CPD instructors had the requisite knowledge and dedication necessary to impart effective training on impartial policing. Independent Monitoring Report 6 6-16, 52, *State of Illinois v. City of Chicago*, No. 17-cv-06260 (N.D. Ill. Jan. Dec. 15, 2022), Dkt. No. 1069. The mixed record underscores the impropriety of noticing the documents at this stage. *See Curtis*, 2019 WL 296555 at * 2 (declining to take judicial notice of reports issued by a federal monitor of the Cook County Jail because there was a plausible, good-faith basis to challenge the monitor's conclusions and they were therefore not "indisputable").

As for the City's other supporting evidence, the parties do not dispute that the Consent Decree itself is appropriate for judicial notice, but differ in their view of its relevance to the City's motion. Suffice to say that while "it may be permissible to take judicial notice of the ***existence*** of the Consent Decree . . . it is unclear how doing so would support defendants' argument," as "the existence of the Consent Decree suggests that the City was aware of the types of constitutional violations complained of by plaintiff." *Haligas v. City of Chicago*, 609 F. Supp. 3d 619, 626 n.1 (N.D. Ill. 2022) (emphasis in original).

The plaintiffs also do not appear to dispute the City's reliance on certain CPD directives, including G02-04 (discussed *supra* and attached to the City's motion as Exhibit A), G03-07 (the temporary foot pursuit policy, attached as Exhibit B), G03-07 (the revised, permanent foot pursuit policy, attached as Exhibit C), and G03-02 (the directive addressing de-escalation and use of force, attached as Exhibit E). Those documents (excepting G03-02) are referenced at some length in the Complaint, so the Court has no issue taking notice of them. The plaintiffs do, however, object to the City's inclusion of a Foot Pursuits Training Bulletin, revised in 2020, which the City argues was approved of by the IM, addressed the Consent Decree's requirement that it revise the bulletin to "reflect[] best practices," and therefore "shows that the City did not turn a blind eye to training on foot pursuits generally[.]" Def.'s Mot. to Dismiss 10-11. But it is not clear the Bulletin is public (or at least the City does not argue as much), nor was it referenced in the plaintiffs' complaint. The Court therefore declines to take notice of the Bulletin.

Clearing aside the City's extraneous material, and focusing only on those facts which are proper for notice at this stage, the City's arguments that they have not been deliberately indifferent to the alleged patterns and practices of bias and excessive force amount to: (1) its revisions to its racial profiling policy, G02-04; (2) its issuance of a temporary foot pursuit policy in June 2021, the first of its kind for CPD, and that policy's replacement in 2022 by a "substantially and

substantively" similar version; and (3) its policy[1] requiring annual training on de-escalation and use of force. The bulk of the City's other arguments rest on the IM reports, which the Court will not consider at this juncture.

Those facts are insufficient to render implausible the plaintiffs' allegations that the City has been deliberately indifferent to CPD's well-documented (and in this case, undisputed) pattern and practice of using excessive force against minorities. Indeed, the complaint alleges that in spite of the existence of the Consent Decree, the City continues to fall short of the Consent Decree's demands by failing to timely implement an adequate foot pursuit policy or provide scenario-based training on that policy, and by failing to fully comply with the Consent Decree's prohibition on officers using deadly force against fleeing subjects who do not impose an imminent threat to others. The complaint also alleges that key stakeholders in CPD's efforts to reform its practices believe that CPD leaders are intentionally resisting reform. All of these allegations are sufficient to state a claim that the City has been deliberately indifferent to CPD's known pattern of unconstitutional practices. Importantly, the plaintiffs rest their *Monell* theory on an allegedly widespread practice—***not*** on an express policy. The City may point to policies and revised policies that set forth constitutionally sound procedures, but the point is that the plaintiffs allege those policies bely the true culture of CPD, even in the wake of the Consent Decree.

The City argues that "simply because a municipality effectuated a policy or training program that could have been more, better, or different," it does not mean that a municipality has been deliberately indifferent. Def.'s Mot. to Dismiss 6. *See, e.g.*, *Lapre*, 911 F.3d at 431 ("The existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent." (quotation marks omitted)). In *Lapre v. City of Chicago*, for example, a plaintiff whose son committed suicide in jail alleged that the City jail's failure to remove horizontal bars from cells and to have a policy of re-assessing inmates for suicide risk after a temporary absence from lock-up (*e.g.*, for a court appearance) amounted to deliberate indifference to the risks of suicide. 911 F.3d at 431. The court held that in light of the City's efforts to build new lockups without horizontal bars, and the plaintiff's lack of evidence that "the policy itself led to additional suicides or that suicides would have been prevented by a different policy," the plaintiff had not shown that "the City acted with the requisite level of fault for a finding of deliberate indifference." *Id*. at 434-45. Similarly, in *Moore v. City of Chicago*, a plaintiff claiming that her injury was caused by the City's widespread practice of failing to investigate and discipline officer misconduct could not prove deliberate indifference where the record showed that the City Council held a series of hearings and effected changes to the police union contract based on its knowledge of issues with CPD's investigation and discipline systems. No. 02-cv-05130, 2007 WL 3037121, at *11 (N.D. Ill. Oct. 15, 2007).

But both *Lapre* and *Moore* were decided on motions for summary judgment. Both courts emphasized the stringent standard of ***proof*** for a finding of deliberate indifference. *See Lapre*, 911 F.4th at 434 ("deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action") (citing *Connick v.*

---

[1] Because G03-02, the de-escalation and use of force policy requiring annual training, appears to be public, the Court will take judicial notice if it, despite the fact that it is not cited in the plaintiff's complaint.

*Thompson*, 563 U.S. 51, 61-62 (2011)); *Moore*, 2007 WL 303 7121 at *11 (deliberate indifference standard is a "high threshold to overcome, even where significant evidence has been presented[.]" (cleaned up)). But the City here has brought a 12(b)(6) motion, meaning the Court is assessing the plaintiffs' allegations rather than their proof, which will come later. For now, the City cannot say that its efforts to comply with the Consent Decree by issuing revised policies constituted meaningful attempts to protect the plaintiffs from constitutional violations. Indeed, the Commanding Officer whose departure email the plaintiffs cite accused CPD of focusing on "policy edits that lack operational considerations." Compl. ¶ 15.

In a wave of litigation arising out of CPD's response to the protests of summer 2020, after the killing of George Floyd, multiple courts have rejected similar arguments from the City. *See, e.g.*, *Cosby v. Rodriguez*, 711 F. Supp. 3d 983, 1011-12 (N.D. Ill. 2024) ("Nor does the existence of the Consent Decree require dismissal of Plaintiff's *Monell* claim. . . . Valuable as it is, the Consent Decree does not defeat a finding that the CPD in fact engaged in other policies or widespread practices in connection with the BLM protests."); *Anderson v. Brown*, No. 23-cv-02245, 2025 WL 815667, at *5 (N.D. Ill. Mar. 14, 2025) ("[A]fter drawing reasonable inferences in Plaintiffs' favor at this stage, Plaintiffs have adequately alleged that the CPD maintained policies and widespread practices that were not covered by the Consent Decree, contradicted the Consent Decree, or were implemented notwithstanding the City's compliance efforts . . . ."); *Reed v. Gallegos*, No. 23-cv-002247, 2024 WL 4826495, at *5 (N.D. Ill. Nov. 19, 2024) ("Even in the face of the Consent Decree, Plaintiff adequately argues that the City failed to implement measures to end CPD officers' widespread practice of using excessive force against protestors."); *see also Fix v. City of Chicago*, Nos. 21-cv-02843 and 21-cv-02846, 2022 WL 93503, at *3 (N.D. Ill. Jan. 10, 2022) (rejecting City's argument that its creation of the Civil Office of Police Accountability in 2016 meant it could not have been deliberately indifferent to unconstitutional practices). The Court agrees with those courts that the Consent Decree efforts the City points to in its motion are insufficient to refute the plaintiffs' well-pleaded allegations of deliberate indifference at this point.

ii. Causation

"The municipality's conduct must be the moving force behind the alleged injury, but it need not be the sole cause." *Taylor v. City of Chicago*, No. 21-cv-02197, 2021 WL 4523203, at *4 (N.D. Ill. Oct. 4, 2021) (cleaned up). The City argues that the plaintiffs have not offered any facts to support the existence of a causal nexus between the CPD's alleged patterns and practices and A.G.'s injuries other than a "conclusory allegation" that Ball was "running with his gun unholstered and carried in hand" because of "racial and socioeconomic bias." Def.'s Mot. to Dismiss 16-17 (quoting Compl. ¶ 56).

This reads the complaint too narrowly. The complaint alleges that the City's failure to meaningfully address CPD's use of excessive force against African Americans—by failing to timely implement a foot pursuit policy or to adequately train officers—caused Officer Ball's conduct:

- "[O]ne reason Officer Ball violated CPD's Use of Force policy is because he was not properly trained on use of force, de-escalation, foot pursuits, and implicit bias." Compl. ¶ 45.

- "The City and CPD's delays [in implementing an effective foot pursuit policy] were a cause for the wrongful and wanton conduct on the part of Officer Ball in shooting A.G." *Id.* ¶ 81.

- "Had CPD updated its policies and provided concomitant scenario-based training to its officers, Officer Ball would have known that: (a) he should not have initiated a foot pursuit because the need to detain A.G. was not outweighed by the risks; (b) he should not have initiated a foot pursuit because alternatives, including CPD units and helicopters, were in place; (c) he should not have unholstered his gun and carried it in hand because A.G. did not present an imminent threat to life or great bodily harm; . . . ." *Id.* ¶ 82.

Drawing all reasonable inferences in the plaintiffs' favor, these allegations are sufficient to plausibly state a claim that the City's deliberate indifference was a moving force behind defendant Ball's conduct.

b. *Illinois Family Expense Act*

The City also moved to dismiss the plaintiffs' claim against it under the Illinois Family Expense Act (Count 8), 750 ILCS 65/15, arguing only that because the plaintiffs had not stated a claim for relief under *Monell*, the derivative claim under the Act should also fail. Because the Court finds that the plaintiffs have stated a claim for *Monell* liability, the City's motion as to the Illinois Family Expense Act is also dismissed.

***

The City's motion to dismiss for failure to state a claim [29] is denied.

Date: July 2, 2025

John J. Tharp, Jr.
United States District Judge